**AVTEC SYSTEMS, INC., Plaintiff,**

**v.**

**Jeffrey G. PEIFFER, et al., Defendants.**

**Civ. A. No. 92–463–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 4, 1992.

Michael L. Zupan, Hazel and Thomas, P.C., Alexandria, Va., for plaintiff.

David Gordon Fiske, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., Douglas James Cole, Taylor, Newsome & Tinkham, Fairfax, Va., for defendants.

## ORDER AND OPINION

MORGAN, District Judge.

### PROCEDURAL BACKGROUND

On April 2, 1992, plaintiff Avtec Systems, Inc. ("Avtec") filed this action against defendants Jeffrey G. Peiffer ("Peiffer"), Paul F. Kisak ("Kisak"), and Kisak–Kisak, Inc. ("KKI"). Avtec charged all defendants with infringement under the Copyright Act (17 U.S.C. § 101 et seq.) of a computer software program that performs various orbital simulations for satellites, known as the Orbit II Plus Program ("Or-

bit Program"). Avtec also charged defendants Peiffer and KKI with misappropriation of trade secrets under Virginia Code § 59.1–336 and misappropriation of business opportunity, and charged Peiffer with breach of fiduciary duty. In addition, Avtec sought to impose a constructive trust.[1]

On April 29, 1992, defendants filed a counterclaim against Avtec, seeking a declaratory judgment naming Peiffer as the sole owner of the Orbit Program, injunctive relief, and damages. Avtec moved for partial summary judgment on July 24, 1992 on the issue of ownership of the Orbit Program. Defendants also moved for summary judgment on July 24, 1992. On September 4, 1992, this Court denied the cross motions for summary judgment. The Court conducted a bench trial commencing on October 5, 1992.

### THE PARTIES

1. Avtec is a corporation organized under the laws of the State of New Hampshire, with its principal place of business in Fairfax County, Virginia and is authorized to do business in the Commonwealth of Virginia. Avtec is primarily a government contractor that markets space related computer services, providing specialized computer products such as computer simulations related to satellite orbital dynamics and satellite orbital analysis. Part of Avtec's work involves information classified by the United States Government.

2. Peiffer is a resident of Fairfax County, Virginia. From May 1984 until April 1992, Peiffer was a full-time employee of Avtec. A major area of Peiffer's work at Avtec was using computer programs to answer questions and solve problems and produce simulations relating to satellite orbital analysis. While performing this work, Peiffer developed substantial expertise in computer simulations of satellite orbits and orbital analysis.

3. Kisak is a resident of Fairfax County, Virginia. Kisak founded KKI, is its

---

1. Defendant Kisak was voluntarily dismissed from the misappropriation of trade secret and misappropriation of business opportunity counts. Kisak was not named in the breach of fiduciary duty count, and thus was only a defendant with respect to the copyright claim.

sole stockholder and serves as its president. Kisak met Peiffer in 1989 and entered into an exclusive licensing agreement with Peiffer to distribute the Orbit Program.

4. KKI is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business in Fairfax, Virginia. KKI was founded to perform satellite simulation and develop commercial products for the satellite industry.

## FACTS

The Court summarizes those facts which are relevant to its finding. Avtec filed its complaint on April 2, 1992, alleging ownership of the Orbit Program, and seeking damages for copyright infringement of the Orbit Program and misappropriation of its trade secret in the Orbit Program. In addition, Avtec claimed misappropriation of its business opportunity, as well as breach of Peiffer's fiduciary duty. Specifically, Avtec alleged that Peiffer developed the Orbit Program in the scope of his employment with Avtec and, accordingly, Avtec owned the Orbit Program by virtue of the "work for hire" doctrine.

The Orbit Program is a computer program which displays orbital simulations and related data in graphic form on a Macintosh computer. Specifically, the Orbit Program displays the path of orbits relative to certain earth positions, the visibility of satellites from certain earth stations, the visibility of stars from the satellite, and calculates and displays various data in a graphic format. The Orbit Program's uniqueness stems from the fact that the Macintosh permits the Orbit Program's user to interact directly with it by using a handheld control known as a "mouse" and the program displays data in graphic form.

Peiffer began working for Avtec part-time as a college student in 1982 and joined Avtec on a full-time basis in 1984. A major portion of Peiffer's work at Avtec was using computer programs and developing simulations for use in satellite orbital analysis. Peiffer's 1982 job description included writing "miscellaneous programs as they are needed for various purposes" and "implementing computer simulation." Peiffer's 1986 job description included simulating "satellite orbits and the various quantities associated with orbits" and "algorithm design and testing." Over his years at Avtec, Peiffer generated numerous reports dealing with satellite orbital analysis using computer programs that performed functions similar to many of those found in the Orbit Program.

Peiffer admits that, while at Avtec, he gained knowledge in orbital routines, orbital calculations and orbital analysis and that some of that knowledge was incorporated into the Orbit Program. In 1985, Peiffer first began developing the Orbit Program. In his 1988 annual performance review, Peiffer demonstrated the Orbit Program to Ronald Hirsch ("Hirsch"), Avtec's president, in response to Hirsch's statement that Avtec employees should show initiative on the job. Hirsch and Greg Kope, another Avtec employee, suggested several modifications to the Orbit Program to prepare it for demonstration as a marketing tool for Avtec. These changes were grafted onto the Orbit Program and Peiffer charged 83 hours to an Avtec Independent Research and Development account for making the suggested enhancements.

In December 1988, Peiffer demonstrated the Orbit Program, including the changes suggested by Hirsch and Kope, as a unique Avtec capability in Avtec's marketing efforts to win a government contract known as the ASSET Contract. In early 1989, in response to Avtec winning the ASSET Contract, Hirsch awarded Peiffer a $5,000 bonus. In January 1989, Peiffer demonstrated the Orbit Program as a unique Avtec capability to the U.S. Air Force as part of Avtec's marketing efforts. In August 1989, Peiffer again used the Orbit Program in a client demonstration known as the LTD/MIPS Proposal.

In February 1990, Peiffer gave the Orbit Program to Ms. Thuvan Nguyen, an Avtec employee, to use in a demonstration of Avtec's ongoing work regarding the engagement of satellites and anti-satellite devices in space. Ms. Nguyen located several errors or "bugs" in the Orbit Program,

Peiffer corrected the bugs, and Ms. Nguyen then used the corrected version to perform the client demonstration known as the SOCM demonstration. In January 1992, Peiffer again demonstrated the Orbit Program to NASA as part of an Avtec effort to obtain a contract. However, unbeknownst to Avtec, Peiffer used an outdated version of the Orbit Program that lacked recent improvements which Peiffer knew were of importance to NASA. Avtec was not awarded this NASA contract. Peiffer believes that had he demonstrated the most recent version of the Orbit Program to NASA, Avtec would have been awarded this NASA contract. In February 1992, Hirsch asked Peiffer to demonstrate the Orbit Program to a potential client who was visiting Avtec's offices. Peiffer refused, and claimed that he did not have a copy of the program at the office.

From 1985 to 1989 the sole commercial use of the Orbit Program occurred in Avtec demonstrations for specific clients. As such, it was a demonstration and marketing device used on specific contracts to meet specific needs. Avtec labelled the Orbit Program as an Avtec trade secret in its 1991 client capability materials. *See* Plaintiff's Trial Exhibit 50. During the 1988 demonstration, the Orbit Program was in a format known as the ".309 version." However, upon meeting Kisak in 1989 Peiffer began developing the Orbit Program into something different—it evolved from a program intended for demonstrations and specific problem solving into a general, "stand alone" software package that could be marketed commercially.

In early 1989, Peiffer met Kisak and discussed marketing the Orbit Program through KKI. Peiffer did not inform Avtec of this meeting. In March 1989, Peiffer signed an agreement with KKI giving KKI an exclusive license to market the Orbit Program. Again, Peiffer failed to inform Avtec of his agreement with KKI. In addition, at no time during his numerous demonstrations of the Orbit Program to Avtec's potential clients did Peiffer ever claim a proprietary interest in the Program. Since its 1989 evolution, sales of the Orbit Program have generated $197,000 in gross revenues for KKI. Peiffer has received approximately $98,500 of this amount.

The Orbit Program that KKI currently markets, known as the "2.05 version," is a different product than the .309 version which Peiffer first demonstrated on Avtec's behalf in 1989. Avtec maintained at trial that the 2.05 version is a derivative of the .309 version and that Peiffer upgraded the Orbit Program with the aid of other Avtec employees and performed those upgrades as work for hire for Avtec. However, the Court FINDS that Peiffer and Kisak were responsible for transforming the Orbit Program from a demonstration and marketing tool into a marketable stand alone program without substantial assistance from Avtec. The Court makes the following findings:

1. Avtec acquired and protected a trade secret in the use of the Orbit Program for demonstration and marketing purposes. On numerous occasions, earlier versions of the Orbit Program were demonstrated for Avtec clients, and it was represented as an example of Avtec expertise and capability.

2. The work performed on the Orbit Program by Avtec employees other than Peiffer, in the form of debugging and specific enhancements, was directed toward the use of the Orbit Program as a demonstration of Avtec capability on client-specific work, and not toward creating a marketable stand alone program.

3. The evidence does not establish that Avtec could have or would have developed the Orbit Program as a marketable stand alone computer program available in the commercial arena.

4. Peiffer did not properly perform the duties an employee owes to his employer during the January 1992 NASA demonstration, when he used the more primitive .309 version of the Orbit Program in lieu of the newer 2.05 version which contained enhancements that NASA had specifically requested. Peiffer also failed to properly perform his duties to Avtec in refusing to demonstrate the Orbit Program in February 1992 to a potential Avtec client. Sig-

nificantly, Peiffer's misconduct occurred after he contracted with KKI to develop and market the Orbit Program as a stand alone product and while he remained a full time Avtec employee, thereby attempting to simultaneously serve two masters.

5. The uniqueness of the Orbit Program as a demonstration and marketing tool for Avtec was based upon the fact that such computer software was not generally available in the commercial marketplace, and specifically, that the Orbit Program offered advanced user interface and graphic display.

6. The .309 version of the Orbit Program possessed significant value as a demonstration or marketing tool but did not possess significant value as a marketable stand alone computer program.

7. Peiffer and KKI should have known of the competitive advantage the Orbit Program gave to Avtec. In addition, KKI has advanced no credible reason for not communicating with Avtec's principals to inquire as to the possibility of an Avtec claim of a proprietary interest in the Orbit Program.

## DISCUSSION

### 1. *Count 1—Copyright Infringement*

Avtec brought this action after discovering that Peiffer was marketing and selling the Orbit Program through Kisak and KKI. Avtec contends that between October 1989 and September 1992 KKI licensed approximately fifty copies of the Orbit Program, earning revenues of $197,000. Avtec asserts that Peiffer personally has received in excess of $98,500 from such licenses. Specifically, Count I of Avtec's complaint charges all three defendants with a violation of the federal copyright laws.

■ The gravamen of Avtec's action centers on the ownership of the Orbit Program.[2] Both parties agree that Avtec's rights in the Orbit Program, if any, arise under the "work for hire" doctrine of 17 U.S.C. § 101(1) and 201(b). The parties disagree, however, on the steps necessary

to satisfy the test. Avtec maintains Peiffer created the Orbit Program in the scope of his employment with Avtec which makes Avtec the program's true owner. Peiffer disputes this, claiming he created the Orbit Program in his spare time, as a "hobby," and in no way created the program for Avtec.

■ In *Community For Creative Non–Violence v. Reid,* the United States Supreme Court discussed the backdrop to the work for hire doctrine and fleshed out the appropriate interpretation of the doctrine. 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The Supreme Court made some initial observations:

> The Copyright Act of 1976 provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. § 102. The Act carves out an important exception, however, for "works made for hire." If the work is for hire, "the employer or other person for whom the work was prepared is considered the author" and owns the copyright, unless there is a written agreement to the contrary. § 201(b).

*Id.* at 737, 109 S.Ct. at 2171 (footnote omitted).

The presumption, therefore, is that the one who *creates* the work is its rightful owner for copyright purposes. This presumption may be overcome however, if the work is one "made for hire." Section 101 of the 1976 Act provides two sets of circumstances that give rise to a "work for hire" of which only one is relevant here: "a work prepared by an employee within the scope of his or her employment...." 17 U.S.C. § 101(1).

■ The Supreme Court laid out a two step analysis in *Reid.* First, courts must determine if the "creator" of the product that is the subject of the copyright dispute

**2.** Avtec's copyright claim in the Orbit Program was registered on March 27, 1992. Peiffer registered his copyright claim in the Program on April 9, 1992.

is a true "employee" of the employer or merely an "independent contractor." Then the court must decide if the product was prepared within the scope of the creator's employment. *Reid,* 490 U.S. at 751, 109 S.Ct. at 2178. As Peiffer was clearly a full-time employee of Avtec for the time period in question, the first inquiry is satisfied and Avtec bears the burden of proving that Peiffer created the Orbit Program in the "scope of his employment."

■ The Supreme Court noted that the 1976 Act failed to define "scope of employment." *Id.* at 738, 109 S.Ct. at 2171. The Court also noted that four different interpretations of the phrase had developed among federal courts considering work for hire claims. The Court rejected those tests that had held a work was created by an employee where the hiring party retained the right to control the product, where the hiring party had actually wielded control with respect to the creation of the particular work, and where the work was created by a "formal, salaried" employee. *Id.* at 738–39, 109 S.Ct. at 2171–72. The Court concluded that Congress intended to incorporate the agency law definition of "employee." "This is suggested by § 101(1)'s use of the term, 'scope of employment,' a widely used term of art in agency law." *Id.* at 740, 109 S.Ct. at 2172 (citing Restatement (Second) of Agency § 228 1958)). Thus, for purposes of determining "scope of employment," the term employee "should be understood in light of the general common law of agency." *Id.* at 741, 109 S.Ct. at 2173. The Court cited the Restatement (Second) of Agency ("the Restatement") as the guide to determine "scope of employment." Section 228 of the Restatement provides:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master....

Restatement (Second) of Agency § 228 (1958).

Thus, the "dispositive inquiry" (quoting *Reid,* 490 U.S. at 738, 109 S.Ct. at 2171) as to Count I of this case is: was Peiffer, admittedly an employee of Avtec, acting within the scope of his employment with Avtec when he created the Orbit Program?

The defendants cite a post-*Reid* district court decision they claim supplies the "crucial element" in deciding work for hire cases. In *Neva, Inc. v. Christian Duplications Int'l., Inc.,* the district court stated that " '[t]he crucial element in this determination *appears* to be whether the work was created at the employer's insistence and expense, or, in other words, whether the motivating factor in producing the work was the employer who induced its creation.' " 743 F.Supp. 1533, 1544 (M.D.Fla.1990) (emphasis added) (quoting *Murray v. Gelderman,* 566 F.2d 1307, 1310 (5th Cir.1978)). Peiffer argues that Avtec cannot own the Orbit Program because Peiffer did not create it at Avtec's insistence or expense. While it appears to the Court that this is true, the Court notes that *Neva* merely quoted a pre-*Reid* case (*Murray v. Gelderman* ) from the Fifth Circuit, the district court's controlling circuit. This calls *Murray* 's precedential value into question to some extent as it was merely one circuit's effort to parse the ambiguous language of Section 101 in the pre-*Reid* era. Further, *Reid* rejected those circuits whose interpretations of § 101's use of "employee" had turned on the employer's right to control the work or its creation. *Reid,* 490 U.S. at 738–39, 109 S.Ct. at 2171–72.

The Court FINDS that Avtec has failed to satisfy the three-part Restatement test articulated by the Supreme Court in *Reid.* Avtec did present evidence that the .309 version of the Orbit Program performs many of the same functions found in reports and other computer programs Peiffer utilized as an employee of Avtec. However, Avtec failed to produce sufficient evidence to satisfy the Court that Peiffer developed the current 2.05 version of the Orbit Program within Avtec authorized time and space limits or that Peiffer was motivated, at least in part, by a purpose to

serve Avtec. Peiffer performed the majority of the work during his non-working hours and utilized his personal computer equipment purchased at his expense. The majority of his work on the Orbit Program occurred in furtherance of his personal hobby, and not to satisfy specific work obligations for Avtec. In addition, while Peiffer allowed earlier versions of the Orbit Program to be used by Avtec for various client demonstrations, Avtec did not produce sufficient evidence to persuade the Court that Peiffer's development of the 2.05 version of the Orbit Program was actuated by his desire to serve Avtec. The Court FINDS that under the *Reid* test there is insufficient evidence for Avtec to satisfy elements (b) and (c) of § 228 of the Restatement and thereby claim ownership of the Orbit Program under the work for hire doctrine. Avtec has failed to overcome the presumption that Peiffer, as the Orbit Program's creator, is its rightful owner for copyright purposes.

The evidence in the case is not sufficient to support a claim of joint authorship under 17 U.S.C. § 101. *See* Notes of Committee on the Judiciary, House Report No. 94–1476 ("a work is 'joint' if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of authors as 'inseparable or interdependent parts of a unitary whole.'"). There is slight evidence of collaboration and less evidence of intent to merge separate efforts into a unitary whole. The evidence is far from convincing that Avtec ever continuously possessed the software. For these reasons, Avtec cannot claim complete or joint ownership of the 2.05 version of the Orbit Program, and its cause of action for copyright infringement must fail. Accordingly, the Court DENIES Count I of Avtec's complaint for copyright infringement.

### 2. *Count II—Misappropriation of Trade Secrets*

Avtec claims in Count II that the Orbit Program constitutes a trade secret under § 59.1–336 of the Virginia Code and alleges misappropriation by Peiffer and

KKI. Virginia law defines trade secret as "information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that derives independent economic value ... from not being known ... and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va.Code Ann. § 59.1–336 (Michie 1992). Both parties agree that the Orbit Program qualifies as a trade secret. *See also Integrated Cash Mgmt. v. Digital Transactions*, 732 F.Supp. 370, 375 (S.D.N.Y.1989) ("[C]omputer software has received judicial recognition as a trade secret."). "Misappropriation" under the Virginia Code is defined as:

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

2. Disclosure or use of a trade secret of another without express or implied consent by a person who ...

b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was ... (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

Va. Code Ann. § 59.1–336 (Michie 1992).

The defendants argue that the Orbit Program contains such elemental concepts of mathematics that it could have been independently discovered by reverse engineering. However, in construing § 59.1–336, the Supreme Court of Virginia has held that "the crucial characteristic of a trade secret is *secrecy rather than novelty....* The secrecy need not be absolute; the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied." *Dionne v. Southeast Foam Converting*, 240 Va. 297, 302, 397 S.E.2d 110, 113 (1990) (emphasis added). The defendants presented no evidence that Avtec disclosed the source code or the executable code of the .309 version of the Orbit Program to anyone outside Avtec. The Court FINDS that reasonable steps were taken to maintain

secrecy during demonstrations. Avtec's office remained locked at all times. Visitors were required to sign in and were escorted about the office by Avtec employees. Peiffer, as the .309 version's creator, did not disclose the Orbit Program's source code or executable code to anyone other than Avtec personnel before becoming involved with Kisak. In addition, Avtec's employee policy manual clearly informed its employees that Avtec's proprietary information and trade secrets were confidential and were not to be disclosed to others.

■ The Court is unpersuaded by Peiffer's and KKI's argument that the Orbit Program was developed from information in the public domain and that no *component* of the program is a trade secret. The Court observes that "a trade secret can exist in a combination of characteristics and components, each of which, *by itself*, is in the public domain, but the unified process and operation of which, *in unique combination*, affords a competitive advantage and is a protectable secret." *Q–Co Indus., Inc. v. Hoffman*, 625 F.Supp. 608, 617 (S.D.N.Y.1985) (emphasis added). The Supreme Court of Virginia has made a similar ruling: "a trade secret 'may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical improvement that a good mechanic can make.'" *Dionne*, 240 Va. at 302–03, 397 S.E.2d at 113 (citing Restatement of Torts § 757 comment (b) (1939)). Clearly, the Orbit Program was unique and provided Avtec a competitive advantage, as demonstrated by the ASSET contract. KKI has marketed it as "unparalleled" and claims: "If you are not using [the Orbit Program], you are definitely operating at a *competitive disadvantage*." Plaintiff's Exhibit 79 (emphasis in original).

The Court FINDS that the use of the .309 version of the Orbit Program as a demonstration and marketing device qualifies as a trade secret under the standard set out in § 59.1–336 of the Virginia Code. The .309 version as used by Avtec clearly possessed independent economic value since it was unavailable in the marketplace and was the subject of reasonable efforts by Avtec to maintain the secrecy of its use. While Avtec never sold or attempted to sell the Orbit Program as a stand alone product, and indeed, presented insufficient evidence that it could or would have done so, it did use the Orbit Program to market its services. Avtec presented substantial evidence at trial that the .309 version possessed many of the functions and computer programming Peiffer utilized specifically for Avtec client demonstrations and specific problem solving. In addition, the Court FINDS that through its contributions to and use of the Orbit Program Avtec acquired a trade secret in the program's use for demonstration and marketing purposes in a similar manner as an employer may possess "shop rights" to an employee's patented invention. *See California Eastern Laboratories, Inc. v. Gould*, 896 F.2d 400, 402 (9th Cir.1990) (citation omitted) ("The doctrine of shop rights has its origins in equity. A shop right is an employer's nonexclusive right to use an employee's patented process or invention that was developed during the employee's hours of employment. The right is based on the employer's presumed contribution to the invention through materials, time, and equipment.").

It is significant that Peiffer performed numerous demonstrations for Avtec's potential clients using the Orbit Program. Peiffer was rewarded for his initiative with a $5,000 bonus following his demonstration of the Orbit Program which contributed to the award of the ASSET contract to Avtec. In addition, Peiffer knew that Avtec held out the Orbit Program as an Avtec capability in marketing demonstrations. Further, Avtec's 1991 capability materials explicitly cited the Orbit Program as a trade secret for marketing purposes. The Court believes that Peiffer, while not creating the 2.05 version of the Orbit Program as a work for hire, granted Avtec a license to use the program as a marketing tool to demonstrate Avtec's capabilities by his numerous demonstrations at Avtec's request.

■ With respect to KKI, the Court believes that it is also liable under § 59.1–336 of the Virginia Code. KKI knew or should have known that it acquired the Orbit Pro-

gram "under circumstances giving rise to a duty to maintain its secrecy or limit its use." Va.Code Ann. § 59.1–336(2)(b)(2) (Michie 1992). Kisak testified that his background in the commercial software industry made him sensitive to proprietary rights in computer products generally. As president of KKI, Kisak cannot be excused for failing to communicate with Peiffer's principals at Avtec to inquire of Avtec's proprietary interest, if any, in the Orbit Program. KKI had an obligation to investigate any ownership claims by Avtec and it failed to do so. As such, KKI is also liable for misappropriation of Avtec's trade secret in the use of the Orbit Program. The misappropriation of Avtec's trade secret has caused it to be damaged and Peiffer and KKI would be unjustly enriched if permitted to retain all benefits and revenues generated by the program. Accordingly, the Court GRANTS relief pursuant to Count II of Avtec's complaint based upon the misappropriation of Avtec's trade secret by Peiffer and KKI.

### 3. Count III—Breach of Fiduciary Duty

In Count III of its complaint, Avtec asserts that as its employee, Peiffer owed Avtec the duties of loyalty, fidelity, non-competition and full disclosure. The Court agrees. Avtec employed Peiffer and others. Avtec had to make a payroll periodically and relied upon the diligence and faithfulness of its employees to contribute toward the revenues required to meet its payroll. It is well established that an employee violates his duty of loyalty, fidelity and responsibility to his employer by using confidential information to the detriment of his employer and to the advantage of a competitive firm. *Sperry Rand Corp. v. Electronic Concepts, Inc.*, 325 F.Supp. 1209, 1219 (E.D.Va.1970). This Court has long held that "[a]n employee is a fiduciary

with respect to the information which comes to him in the course of his employment. He must exercise good faith, loyalty and honesty towards his employer whether coupled with an interest or not, and whether the compensation is small or large...." *Bull v. Logetronics*, 323 F.Supp. 115, 133 (E.D.Va.1971) (emphasis added; quotation omitted) (citing Vol. 53 Am.Jur.2d, p. 170, ¶ 97).[3] This Court has recently noted that "Courts have imposed on a fiduciary an affirmative duty of utmost good faith and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading one with whom he deals." *Hartford Accident and Indemnity Co. v. Cox*, Civil Action No. 87–456–N 1988, 1988 WL 241123, at *3, 1988 U.S. Dist. LEXIS 6567, at *7 (E.D.Va. June 29, 1988), *aff'd* 870 F.2d 654 (4th Cir.1989) (citing *S.E.C. v. Capital Gains Research Bureau*, 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963)). Those employees who occupy a "high position of trust and confidence" with their employers, have a "duty to exercise and maintain the utmost good faith, fairness, fidelity, care and skill." *Id.*, 1988 WL 241123 at *3, 1988 U.S. Dist. LEXIS at *8 (citations omitted). *See also Community Counselling Serv. v. Reilly*, 317 F.2d 239, 244 (4th Cir.1963) ("Above all, [an employee] should be candid with his employer and should withhold no information which would be useful to the employer on the protection and promotion of its interest.").

It is further undisputed that in March 1989, Peiffer and KKI entered into an agreement where Peiffer granted KKI an exclusive license to market and distribute the Orbit Program. This activity transpired while Peiffer was still a full-time employee of Avtec and occurred without Avtec's knowledge. The Court finds that at this point, Peiffer began serving two

---

**3.** Peiffer argues that *Bull* is inapposite because it involved a written agreement not to compete. The Court does not find that the Court's discussion turned on this agreement. Indeed, *Bull* cited the American Jurisprudence's section on master-servant relationships which imposes the fiduciary duty even in the absence of any written agreements: *"Aside from any duties express-*

*ly imposed or undertaken by the employee in the contract of employment,* the law implies various obligations and undertakings by an employee.... An employer has the right to expect loyalty from his employees as long as the employment relationship continues." 53 Am. Jur.2d § 97, at 170 (emphasis added).

masters—Avtec and KKI. *See Eaton Corp. v. Giere,* 971 F.2d 136, 141 (8th Cir. 1992) ("[A]n employee owes his employer a duty of loyalty which prohibits him from soliciting the employer's customers for himself, or from otherwise competing with his employer while he is still employed."); *United Centrifugal Pumps v. Cusimano,* Civil No. 87–3074, 9 U.S.P.Q.2d 1171 (available on WESTLAW, USPQ database *26), 1988 U.S. Dist. LEXIS 11012, at *31 (W.D.Ark. August 31, 1988) ("[D]uring the course of his employment [the employee] must be loyal to his employer and not attempt to set up a competitive business with the business of his employer.").

Peiffer takes the position that Avtec's mere use of the Orbit Program did not create any proprietary interest in its use, but, as previously noted, Peiffer repeatedly permitted its use and cited the program to Hirsch as evidence of his initiative. Peiffer admittedly received a bonus from Avtec based upon the ASSET demonstration of the Orbit Program. Peiffer should have used an updated version of the Orbit Program in the January 1992 NASA demonstration, which occurred when he was still a full time paid employee of Avtec. Accordingly, the Court FINDS that Peiffer breached his fiduciary duty to Avtec at this time when he failed to use the current version of the program and when he failed to notify Avtec he was using an outdated version for this important demonstration. Another breach of Peiffer's fiduciary duty occurred in February 1992 when he refused Hirsch's request that he demonstrate the Orbit Program for a potential Avtec client at Avtec's office. As a result of these breaches of his fiduciary duty, Avtec has been damaged and Peiffer would be unjustly enriched if permitted to retain all benefits and revenues generated by the Orbit Program. Accordingly, the Court GRANTS relief pursuant to Count III of Avtec's complaint based upon Peiffer's breach of his fiduciary duty to Avtec.

### 4. *Count IV—Misappropriation of Business Opportunity*

Avtec withdrew Count IV which asserted misappropriation of business opportunity by Peiffer and KKI. The Court, therefore, need not discuss Count IV.

### 5. *Count V—Constructive Trust*

The Court FINDS that based upon Avtec's trade secret in the use of the Orbit Program as a demonstration and marketing tool which was misappropriated by Peiffer and KKI, and as a result of Peiffer's breach of his fiduciary duty to Avtec, Peiffer and KKI would be unjustly enriched if permitted to retain all benefits and revenues generated by the Orbit Program. Accordingly, the Court GRANTS Avtec's request to impose a constructive trust upon Peiffer and KKI. *See Remington Rand v. Business Systems Inc.,* 830 F.2d 1260 (3rd Cir.1987) (misappropriation of trade secret may give rise to the judicial imposition of a constructive trust); *Greenspan v. Osheroff,* 232 Va. 388, 400, 351 S.E.2d 28, 36–37 (1986) (citation omitted) ("A constructive trust is created by operation of a law and is independent of the intention of the parties. It may arise from a breach of fiduciary duty as well as from actual or unconscionable conduct amounting to constructive fraud."). *See also Community Counselling Serv. v. Reilly,* 317 F.2d 239, 244 (4th Cir.1963) (court ordered an accounting of an ex-employee regarding the profits he received from conduct in violation of his fiduciary duties to his employer).

Accordingly, the Court ORDERS that Peiffer and KKI shall license the use by Avtec of the Orbit Program for the same purposes as a purchaser might lawfully utilize it. The Court further ORDERS that Peiffer and KKI remit to Avtec fifteen (15) percent of the gross revenues realized by KKI from the Orbit Program from the period March 1, 1989 to the date of this Order as well as fifteen (15) percent of any future gross revenues generated by the Orbit Program through the efforts of KKI and any of its successors in interest. *See Davey v. King,* 595 A.2d 999, 1003 n. 6 (D.C.App.1991) (under certain circumstances a court may properly impose a constructive trust in perpetuity). In addition, the Court ORDERS that Avtec's license for the use of the Orbit Program shall continue

so long as Peiffer or his successors in interest retain a copyright interest in the program. The Court also ORDERS that Peiffer and KKI immediately make available to Avtec as a licensee all current versions of the Orbit Program. All enhancements and upgrades that Peiffer and KKI or any successor in interest to either may develop shall be made available to Avtec before any such enhancements and upgrades of the Orbit Program are marketed or made commercially available. Although the Court FINDS that Peiffer owns the 2.05 version of the Orbit Program for copyright purposes, it further FINDS that the use of such program and its enhancements as well as a portion of the revenues generated therefrom must be shared with Avtec as a portion of the Court's damage award.

### 6. *Defendants' Counterclaims*

Defendants counterclaimed asserting ownership of the copyright to the Orbit Program. The Court FINDS that Peiffer owns the version of the Orbit Program for which he made copyright application. Accordingly, the Court ORDERS Avtec to withdraw its March 27, 1992 copyright application. The Court FINDS that the defendants have failed to establish any damages resulting from Avtec's alleged violation of Peiffer's copyright and DENIES Peiffer's and KKI's request for monetary damages.

The Court denies the requests of all parties for attorneys' fees and the costs of this proceeding.

The clerk is REQUESTED to mail a copy of this Order to all counsel of record.

It is so ORDERED.